In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00096-CR


______________________________




MICHAEL MARION ALLEN, SR., Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 402nd Judicial District Court


Wood County, Texas


Trial Court No. 16,597-2001




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Justice Grant



O P I N I O N



 Michael Marion Allen, Sr. was indicted on five charges of aggravated kidnapping, (1) two
charges of aggravated assault with a deadly weapon, (2) and one charge of felon in possession of a
firearm. (3) By agreement between the State and Allen, all cases were consolidated for purposes of
trial, and in a single hearing, Allen waived formal reading of the indictment on all charges and
pleaded guilty to all charges and all enhancements thereto, and the trial court found him guilty on
each cause. 

 Allen elected to have the jury decide his punishment. The jury returned a verdict assessing
punishment at seventy-five years' imprisonment. The trial court sentenced Allen in accordance with 
the jury's verdict. Sentences in all causes were to run concurrently. Allen filed a timely Notice of
Appeal.

 Allen raises two issues on appeal: 1) that the trial court committed reversible error in failing
to sustain his challenge for cause to a prospective juror and 2) that the trial court committed
reversible error in excluding evidence favorable to him at punishment. One brief was filed by each
party for this case and all companion cases, raising the same issues in each case. 


Statement of Facts All eight charges arise out of the same episode. Allen's brief sets forth a statement of facts,
in which the State has concurred. We set forth verbatim that version of the facts of the case, with
specific record references omitted:

 On January 11, 2001, Michael Marion Allen, Sr., Appellant, went to the home
of his ex-wife, Jennifer Coker, located in Quitman, Texas. At the time of his arrival,
the only people at the home were Jennifer's mother, Ginger Canady, Michael and
Jennifer's biological son, Michael Allen, Jr. along with Jennifer's two other sons by
her subsequent marriage to Brian Coker, Dylan Coker and Brian Coker, Jr.

 

 Earlier in the day, Michael Allen had called the home looking for Jennifer,
ostensibly because he had some papers for her to sign regarding their son. 
Additionally, he had also spoken by phone to Brian Coker, Sr. indicating that he
needed to talk to Jennifer. Sometime that afternoon, Appellant drove to the home to
wait for his ex-wife, and while there, spent some time with his son and one of
Jennifer's other boys outside the house.

 

 Upon the arrival of Jennifer Coker, Appellant spoke with her briefly before
both went into the house. Within a relatively short time after entering the house,
Appellant produced a handgun that he had previously taken from the room of his
girlfriend's son. Everyone was told to "shut up and sit down," and the hostage
situation began.

 

 Brian Coker came home at approximately 5:30 p.m. and opened the door to
enter. After seeing what was taking place, he shut the door and drove to the police
station. No one was there so he went to the Sheriff's office and led them back to his
house. Quitman Chief of Police Bill Wansley was notified by phone and he
immediately left for the scene. Not long after he initially produced the gun, and
before the police arrived, the Appellant allowed Ginger Canady and the two Coker
boys to leave the home. 

 

 Shortly after the incident began, Appellant began asking to talk with his
parole counselor, a Mr. Barr, but he could not be reached. Appellant also wanted to
speak with his mother, Francis Cooper, who was at the family business in Shreveport,
La. at the time. He also asked to speak with his girlfriend, Virginia Patterson, who
was contacted at work in Sulphur Springs, Texas and immediately made
arrangements to go to the scene.

 

 Over the next 3 - 3 1/2 hours, Appellant had numerous phone conversations
with Chief Wansley, and his mother. There were approximately eleven peace
officers stationed outside the house. Michael Allen, Jr. was ultimately released,
leaving only the Appellant and his ex-wife, Jennifer Coker, in the house. They came
out on the porch one time, with the gun pointed at the head of Mrs. Coker, and then
went back inside. Shortly thereafter, the two came out again and sat down on the
porch with the gun still at the head of Mrs. Coker.

 

 Allen ultimately dropped out the ammunition clip from the gun and then
threw the gun on the ground at which time he was arrested, ending the standoff.

 

The Refusal of the Trial Court to Disqualify Venireperson No. 9, Sharon Poteet/Cox

 In his first issue, Allen contends the trial court erred in refusing to sustain his challenge for
cause of a prospective juror. Venireperson Number 9 was shown on the jury list as being "Sharon
Poteet," but was identified in the voir dire proceedings as "Mrs. Cox." Later in the voir dire, 
Poteet/Cox approached the bench regarding her fitness to serve as a juror in this case, and defense
counsel's challenge for cause was denied.

 The State contends that Allen has not properly preserved this alleged error for appellate
review. In order to present reversible error due to the trial court's erroneous refusal to sustain a
challenge for cause to a prospective juror, an appellant must show: 1) that all peremptory challenges
were exhausted; 2) that the trial court denied the appellant's request for additional peremptory
challenges; and 3) that a venireperson upon whom the appellant would have exercised a peremptory
challenge was, in fact, seated on the jury. Adanandus v. State, 866 S.W.2d 210, 220 (Tex. Crim.
App. 1993); Schumacher v. State, No. 06-00-00192-CR, 2001 Tex. App. LEXIS 8144, at *10-11
(Tex. App.-Texarkana 2001, pet. filed). 

 The record of the voir dire proceedings contains no showing of exhaustion of Allen's
peremptory challenges or any request for additional challenges. The record fails to demonstrate that
the objectionable venireperson was seated on this jury. Under the authority cited above, this issue
is overruled as not being properly preserved for appeal.

 This issue is overruled.

The Trial Court's Ruling Excluding Evidence of Possible Child Abuse

in the Coker Household Prior to the Events in Question


 Allen's second issue concerns the ruling of the trial court excluding from evidence, on
objection by the prosecution, of evidence pertaining to possible child abuse occurring in the Coker
household prior to the time of the events occurring in this case.

 Specifically, testimony was offered concerning suspicious bruises on the body of Allen's son,
Mikey, which had resulted in the school that Mikey attended contacting Children's Protective
Services (CPS). There was testimony, by way of an offer of proof outside the jury's presence, that
Chief Wansley was personally aware CPS had been involved with the Coker family on more than
two occasions. Chief Wansley further testified he had actually accompanied CPS to the Child
Advocacy Center in Winnsboro for the purpose of taping an interview with one of the Coker
children. 

 A trial court's ruling on the admission or exclusion of evidence may not be disturbed on
appeal unless an abuse of discretion is shown. Erdman v. State, 861 S.W.2d 890, 893 (Tex. Crim.
App. 1993). The appellate court looks to see whether the trial court acted without reference to any
guiding rules or principles; that the appellate court may decide the ruling differently does not
demonstrate an abuse of discretion. The trial court's determination will not be reversed if its ruling
is within the zone of reasonable disagreement. Hardin v. State, 20 S.W.3d 84, 90 (Tex.
App.-Texarkana 2000, pet. ref'd). 

 Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a) (Vernon Supp. 2002) pertains to admission
of evidence at the punishment stage of a criminal trial and provides that evidence may be offered by
the prosecution and the defense "as to any matter the court deems relevant to sentencing, including
but not limited to . . . the circumstances of the offense for which he is being tried . . . ." (Emphasis
added.) As "relevant" is not defined by the Texas Code of Criminal Procedure, the definition of the
word as found in Tex. R. Evid. 401 (4) is "helpful to determine what should be admissible under article
37.07 section 3(a)." Rogers v. State, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999). Evidence at
sentencing presents different issues from those to be determined at guilt/innocence. The judge or
jury at the punishment stage must choose a punishment range; there are no discreet factual issues to
decide and no distinct facts of consequence that proffered evidence can be said to make more or less
likely to exist. Admissibility of evidence at the punishment stage of a noncapital felony case has
been said to be of a function of policy than of relevancy. Relevancy at punishment should be a
question of what is helpful to the judge or jury in determining the appropriate sentence for a
particular defendant in a particular case. Rogers, 991 S.W.2d at 265; Miller-El v. State, 782 S.W.2d
892, 895-96 (Tex. Crim. App. 1990); see also Mendiola v. State, 21 S.W.3d 282 (Tex. Crim. App.
2000).

 The disputed evidence arose during defense counsel's cross-examination of one of the State's
witnesses, Chief Wansley, the lead officer at the scene of the hostage situation. Defense counsel
attempted to question Chief Wansley about his previous contacts with Allen, specifically pertaining
to allegations of child abuse occurring at the Coker home. After the State objected, the jury was
dismissed and, on an offer of proof on questions from counsel, Chief Wansley testified he had heard
of three previous occasions when CPS had been called to the Coker household. Chief Wansley
personally accompanied one of the children to the Child Advocacy Center in Winnsboro for a taped
interview. Chief Wansley testified he was "told" that the school one of the children attended had
noticed suspicious bruises and reported the matter to CPS. At the offer of proof, the State questioned
Chief Wansley, and he testified he had formerly lived next door to the Cokers and he had not
personally witnessed any activity that could be considered abuse. He further testified that on the
night of the events in question, he was the hostage negotiator and that Allen never mentioned
anything at that time about his actions being related to allegations of child abuse. Further, Allen's
contacts with Chief Wansley about the abuse allegations occurred approximately six months before
the hostage-taking event, although defense counsel suggested it was more like two months. 

 In sustaining the State's objections, the trial court specifically noted the remoteness of the
child abuse allegations to the events of that night, and the prosecutor also noted that Allen, during
the hostage-taking situation, had not mentioned the alleged abuse. The trial court later, however,
specifically left open the possibility that defense counsel could recall Chief Wansley, after Allen had
testified as to his state of mind. (It had already been indicated that Allen would testify. However,
Allen never attempted to recall Chief Wansley. 

 We find no abuse of discretion in the trial court's ruling. The remoteness of the allegations,
and the fact that the allegations were never mentioned by Allen at the scene of the crime, gives at
least some indication that the abuse claims may have been an afterthought, rather than a precipitating
factor in Allen's actions. There was never any testimony connecting the mother with the alleged
abuse occurring at the Coker home. Further, Allen did, in fact, testify at the punishment stage of the
trial, and although hearsay statements were not permitted in front of the jury, Allen was permitted
to testify as to his alleged concerns of physical abuse of Mikey. It is clear from the trial court's
rulings that it was concerned about the relevance and the of hearsay aspects of such evidence. These
are legitimate concerns of a trial court, and it can certainly not be said that its rulings were made
without any guiding rules or principles, or that they were outside the zone of reasonable
disagreement.

 Further, even if the trial court's rulings regarding admission of such evidence were erroneous,
Allen must still show harm in such ruling in order to demonstrate reversible error. Tex. R. App. P.
44.2(a) states that in the case of a "constitutional error" subject to harmless error review, the court
of appeals must reverse a judgment of conviction or punishment unless the court determines beyond
a reasonable doubt that the error did not contribute to the conviction or punishment. On the other
hand, under Tex. R. App. P. 44.2(b), all other errors, defects, etc. must be disregarded if they do not
affect substantial rights. In Potier v. State, 68 S.W.3d 657 (Tex. Crim. App. 2002), the Court held
that erroneous evidentiary rulings by a trial court must deny a criminal defendant his right to present
a meaningful defense in order to rise to the level of "constitutional error." The exclusion of a
defendant's evidence will be constitutional error only if the evidence forms such a vital portion of
the case that exclusion effectively precludes the defendant from presenting a defense. Id. at 663,
665. As noted above, Allen's personal observations of bruises on Mikey, and his thoughts as to how
those bruises got there, were, in fact, presented to the jury, even if the hearsay evidence was not. 
Thus, denial of admission of Chief Wansley's testimony did not prevent Allen from bringing this
matter to the jury's attention. Allen did not further attempt to call Chief Wansley later in the trial,
as he was invited to do by the trial court. Even if error, the trial court's ruling did not prevent Allen
from presenting a meaningful defense, and thus, the standard of Rule 44.2(b) applies. Under the
circumstances, we hold that even if error was committed in the exclusion of Allen's proffered
evidence, it did not affect his substantial rights. 

 This issue is overruled.

 Finding no reversible error, the judgment of the trial court is affirmed.

 



 Ben Z. Grant

 Justice


Date Submitted: April 22, 2002

Date Decided: May 21, 2002


Publish
1. Nos. 06-01-00096-CR (Trial Court No. 16,597-2001); 06-01-00097-CR (Trial Court No.
16,598-2001); 06-01-00099-CR (Trial Court No. 16,601-2001); 06-01-00100-CR (Trial Court No.
16,602-2001); 06-01-00101-CR (Trial Court No. 16,603-2001).
2. Nos. 06-01-00102-CR (Trial Court No. 16,607-2001); 06-01-00103-CR (Trial Court No.
16,608-2001).
3. No. 06-01-00098-CR (Trial Court No. 16,599-2001).
4. "Relevant evidence" means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less probable than it would
be without the evidence.



script:WPShow('WPFootnote5', WPFootnote5 )">

 He explains that he crushed two vertebrae in his neck and suffered a collapsed disk
in his back. He underwent surgery for these injuries and testified that this surgery "put [him] out of
work for about nine months." Assuming that Woods was able to work after this nine-month period,
we note that such calculations result in the conclusion that Woods was able to work, at the latest and
according to his own testimony, sometime around December 2003, the first month for which Woods
was convicted. This time frame is somewhat consistent with Woods' later assertion that he was able
to work at least half a day starting sometime around January or February. This evidence does not
support a conclusion that the accident rendered him unable to work for the five relevant months.
            Woods also testified his doctor ordered him not to work at all for three months following the
accident.


 This evidence, taken as true, establishes only that Woods was unable to work for the three
months following the accident, a time period that preceded the time period for which Woods was
convicted. That is, even if the jury did believe that the accident in March 2003 rendered Woods
unable to work and, thus, provide support, the three months for which Woods testified he was
ordered not to work had passed before the months the State alleged in its indictment. Therefore, this
evidence also fails to establish the affirmative defense for the relevant time period.
            Woods attempted to explain the whereabouts of the fairly substantial severance payment that
he received when he was laid off at TXU in March 2000. First, he noted that the amount he
received, after deductions, was approximately $30,000.00 rather than the $47,000.00 that the State
claimed. By December 2003, it appears nothing remained of the severance package money. Woods
explained he had to pay for fairly substantial legal fees that had accumulated over the previous year. 
The record supports this assertion by showing that, within a four-year period, Barbara had filed some
seventeen motions for contempt relating to their divorce and child custody, which often resulted in
Woods' being ordered to pay Barbara's legal fees. Woods also had gone through a third divorce with
another woman. So, Woods testified, he was having to support this ex-wife in the pendency of that
divorce and also provide a household for himself. For these reasons, the money he received in
March 2000 had been exhausted and was not available as a source of child support payments after
nearly four years, several legal proceedings, and another divorce. 
            As discussed, the State presented evidence through a former employer that Woods was
eligible for rehire during the relevant months. The record shows that Woods' last formal
employment was terminated in November 2002, at which point he was eligible to seek to be rehired
by this former employer. Again, there is no evidence that Woods pursued such employment
possibility. Such evidence supports the jury's implied conclusion that Woods was able to provide
support.
            The record also shows that Woods sought financial assistance from the government,
including unemployment compensation. While not providing Woods the income he received when
he worked at TXU, these possible sources of income could have provided him some financial
resources from which he could have paid support. See Howard, 245 S.W.3d at 335. Taken with the
evidence that Woods borrowed and earned money, this evidence provides some evidence Woods
either did, or could have, had some additional money at his disposal.
            Barbara also suggested that Woods had several vehicles he could have liquidated to provide
support for the children and, in that same vein, the State pointed out that, during the months at issue,
Woods was riding a Harley-Davidson motorcycle. The record shows that the 1993 Ford Bronco was
totaled in the March 2003 accident and that Woods drove the motorcycle—purchased in 1997—as
his primary vehicle. The remaining vehicles were late-model "junkers," as Woods described them,
purchased before his marriage to Barbara. The record suggests that the motorcycle was Woods' only
form of transportation after the accident and was not, as the State suggested, a sign of wealth and
indulgence. So, the record does not show that Woods owned a great deal of assets with which he
could have raised the money for child support payments. However, Woods testified he had
borrowed some money from a friend and signed his motorcycle over to the friend as collateral,
providing at least some income.


 
            The Fort Worth Court of Appeals examined similar evidence in a similar context. See id. 
at 335–36. The evidence showed that Howard received social security income and anywhere from
$600.00 to $1,000.00 per month from rental property. Id. at 335. The record also showed that
Howard had settled a lawsuit against an employer for $43,000.00 and performed odd jobs for cash. 
Id. Such evidence was legally sufficient. When the court examined all relevant evidence, it also
pointed out evidence that supported Howard's assertion of inability to provide support. Id. at 336. 
There was evidence that Howard was illiterate and had been incarcerated for two years. Id. He also
introduced documentary evidence supporting his claim of disability. Id. Nonetheless, Howard's
evidence was not of such great weight that the jury's rejection of his defense was manifestly unjust. 
Id. at 337. The court measured such evidence in light of evidence of Howard's income, his ability
to perform some work, and the fact that he had supported his son in the past while the mother was
in jail. The court concluded that the evidence was factually sufficient to support the jury's implicit
rejection of Howard's defense. Id.
            Here, Woods admits he did not make any payments during the relevant months of December
2003 and January, February, March, and April 2004, leaving only the issue of whether he was able
to provide support for the children during those months. In reviewing the factual sufficiency of the
evidence, we must not substitute our judgment in the place of the jury's verdict. See Meraz, 785
S.W.2d at 154. The record, through evidence that Woods was physically able to work, was eligible
to be rehired, retained marketable skills and education, and had actually been performing some
handyman work, provides support for the jury's rejection of the notion that Woods was unable to
provide support. While the record here, as in Howard, provides evidence on each side of the issue
concerning the affirmative defense, after considering all the evidence relevant to Woods' ability to
support his children during the five months alleged, we cannot say that the jury's rejection of the
affirmative defense is against the great weight and preponderance of the evidence.
(3)       The Judgment Should Be Reformed to Reflect the Dates of the Offenses for Which Woods
Was Convicted and Date on Which Sentence Was Imposed
            Woods contends, and the State concedes in large part, that the trial court's judgment should
be corrected. After the jury returned its verdict June 29, 2005, the trial court postponed sentencing
until July 13 so that it could get a presentence investigation report and consider the issues concerning
community supervision in light of the fact that Woods had withdrawn his application for community
supervision and wished, instead, to serve the remainder of his sentence. The trial court orally
pronounced judgment against Woods July 13, 2005, and ordered Woods to serve the remaining two
weeks of his sentence. 
            The trial court signed its original order June 29. The original judgment showed that Woods
had served 336 days of his one-year sentence. The trial court later signed its judgment nunc pro tunc,
which reflected that Woods had served 350 days of his sentence. This corrected judgment shows
to also have been signed and filed June 29. It does, however, show that sentence was to commence 
July 13, the date sentence was pronounced. It shows only an offense date of "December 3rd, 2003." 
As to the formal announcement of each count for which Woods was convicted, the judgment is silent
as to the dates of each offense. 
            Woods now requests that we reform the trial court's judgment in three aspects. First, he asks
that we reform the judgment to reflect time credited as 350 days. Second, he asks that we reform
the judgment to show the dates of each offense as alleged in the indictment. Finally, he asks that we
reform the judgment to reflect that it was entered and filed July 13, rather than June 29. The State
points out that the corrected judgment does, in fact, reflect the requested number of days credited,
but expressly does not object to any of the other proposed changes in the trial court's judgment.
            We have the authority to reform the trial court's judgment under certain circumstances. See
Tex. R. App. P. 43.2(b). We exercise such authority only when the proper action to be taken is
clearly indicated and does not involve an act of judicial discretion. An appellate court may correct
and reform a trial court judgment to make the judgment congruent with the record. Nelson v. State,
149 S.W.3d 206, 213 (Tex. App.—Fort Worth 2004, no pet.); Nolan v. State, 39 S.W.3d 697, 698
(Tex. App.—Houston [1st Dist.] 2001, no pet.). Since we have all information and evidence
necessary for reformation on these matters, we may reform the judgment and sentence on appeal. 
See Brewer v. State, 572 S.W.2d 719 (Tex. Crim. App. 1978); Graham v. State, 693 S.W.2d 29, 31
(Tex. App.—Houston [14th Dist.] 1985, no pet.).
            First, we look to the issue of reforming the trial court's judgment to reflect the dates of each
of the five offenses. Woods requests that we modify the judgment to reflect those dates as alleged
in the indictment and as found in the jury's verdict.
            "The judgment shall reflect . . . the date of the offense or offenses" for which the defendant
was convicted. See Tex. Code Crim. Proc. Ann. art. 42.01, § 1(14) (Vernon Supp. 2005). In this
respect, the trial court's judgment should be reformed. Woods does not contend that the evidence
was insufficient to prove the dates alleged. Rather, he simply requests that we reform the judgment
to mirror the dates as alleged in the indictment. Here, the record clearly shows the dates of the
offenses for which Woods was convicted. In its verdict, the jury found Woods guilty of five offenses
as alleged in the indictment. The State alleged five counts of criminal nonsupport, occurring on
December 1, 2003; January 1, 2004; February 1, 2004; March 1, 2004; and April 1, 2004,
respectively. The record is clear on this issue and, accordingly, we reform the judgment to reflect
the dates of the offense for which Woods was convicted as those dates alleged in the indictment. 
            The judgment properly indicates a sentencing date of July 13, 2005. It is from this date that
we calculated the applicable appellate timetables. While we do not think such reformation is
necessary at this juncture to protect any of Woods' rights, we note that the State concedes the issue. 
So, to the extent that the judgment does not already reflect a sentencing date of July 13, 2005, we
reform the judgment to reflect that the judgment was entered against Woods July 13, 2005.
            Woods contends we should reform the trial court's judgment to show that Woods was
credited 350 days served toward his one-year sentence. However, the trial court's corrected judgment
clearly does this. Therefore, Woods' issue concerning the reformation of the judgment in terms of
the amount of time served is moot.
            We reform the judgment of the trial court to reflect the dates of Counts I through V as
follows: December 1, 2003; January 1, 2004; February 1, 2004; March 1, 2004; and April 1, 2004,
respectively.  Further,  we  reform  the  judgment  to  reflect  that  the  date  judgment  was  entered
was July 13, 2005, the day on which the trial court orally pronounced sentence against Woods. 
 
 
 
Having concluded that the evidence was legally and factually sufficient to support the jury's verdict,
we affirm the trial court's judgment, as reformed.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          March 2, 2006
Date Decided:             May 23, 2006

Do Not Publish