COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-126-CR
 
 
 
EX 
PARTE
  
 
SWANDA 
MARIE LEWIS
 
 
------------
 
FROM 
CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
 
------------
 
OPINION ON REMAND
 
------------
INTRODUCTION
        On 
January 16, 2003, we issued our opinion reversing the trial court’s denial of 
pretrial habeas relief. Because we concluded that the State’s repeated use of 
Appellant’s post-arrest silence constituted impermissible prosecutorial 
conduct, we held that the trial court abused its discretion in denying 
Appellant’s application for writ of habeas corpus on double jeopardy grounds. 
We rendered judgment dismissing Appellant’s case with prejudice because of the 
mistrial.
        On 
the State’s petition for discretionary review, the Texas Court of Criminal 
Appeals vacated our opinion and remanded the case to this court for 
reconsideration in light of its opinion in Ex parte Peterson, 117 S.W.3d 
804 (Tex. Crim. App. 2003).  In Peterson, the court of criminal 
appeals clarified “the standards under which the Texas constitutional double 
jeopardy provision, as explained in Bauder v. State, prohibits a retrial 
after the defense successfully requests a mistrial.”  Id. at 807.  
The parties have rebriefed their arguments in light of the Peterson 
holding, and the case has been resubmitted for consideration under Peterson.  
In her sole point, Appellant argues that the trial court erred in denying her 
application for writ of habeas corpus alleging double jeopardy because of the 
State’s comment on her silence.  Because we hold that the trial court 
abused its discretion by denying the relief sought in Appellant’s application 
for writ of habeas corpus, we reverse and render.
FACTUAL AND PROCEDURAL BACKGROUND
        Swanda 
Lewis, Appellant, met and married Kenneth Wiley in 1999.  Marital problems 
quickly developed, and Appellant found out that Wiley had an affair with his 
ex-wife. Wiley also began disappearing for days at a time, and during one such 
absence, the Health Department informed Appellant that Wiley had contracted 
A.I.D.S.  As a result of this discovery, Wiley and Appellant sought 
counseling through the Health Department, and Appellant agreed to continue to 
have sexual relations with him, so long as he wore a condom.  At first 
Wiley abided by their arrangement; however, in the early morning hours of August 
10, 2000, Wiley allegedly raped Appellant without a condom.
        The 
morning after the assault, Wiley left the house. When he came home that 
afternoon, he and Appellant argued. During an ensuing fight, Wiley was shot and 
killed. Appellant was charged with murder, and her trial began in November 2001. 
The State offered the testimony of a jail house informant; a paramedic, who 
responded to the 911 call; the responding crime scene officer; the medical 
examiner; and Wiley’s brother, none of whom witnessed Wiley’s death. At 
trial, the medical examiner opined that Wiley died as a result of a contact 
gunshot wound to the back of his head.[1]  During 
its case-in-chief, the State did not call either the responding officer or the 
investigating detective to testify, nor did the State attempt to introduce into 
evidence any statements Appellant had made to these officers.
        After 
the State rested, Appellant took the stand in her own defense. Appellant 
testified that Wiley had raped her two times and when he came back home that 
afternoon, they began to argue. Appellant said that Wiley began taking clothes 
to the car, and she went into the bedroom to ensure that he did not take some 
clothes that she had just bought him. She said that as she entered the bedroom 
she saw Wiley’s handgun lying on the foot of the bed. Appellant stated that, 
when she saw the gun, she became afraid so she put the gun in the back of her 
pants. Appellant testified that as Wiley returned to the house, she noticed the 
car keys hanging on the wall by the door. She testified that she started walking 
towards the door to get the keys and when she passed Wiley he grabbed her and 
pinned her arms down to her sides. She stated Wiley began bouncing her up and 
down and the gun began to slide down her pants. Appellant said during their 
struggle her arm got loose and she pointed the gun at Wiley in an attempt to 
scare him. Appellant then testified that the gun went off, but she did not 
intend to pull the trigger.
        Appellant 
called 911 and was placed in the patrol car when officers arrived. On the second 
day of trial, the State conducted a voir dire examination, outside the presence 
of the jury, of Officer Matthew Moore, who responded to the scene, and Detective 
John McCaskill, who interviewed Appellant at the police department. Both 
officers testified that they had each advised Appellant of her Miranda 
warnings, and both stated that Appellant had provided statements to them. The 
purpose of the voir dire examination was to show the voluntariness of 
Appellant’s statements. However, the State did not attempt to introduce any of 
Appellant’s statements into evidence. The trial court found on the record that 
when Appellant was placed in the patrol car she was under arrest and had been 
advised of her Miranda warnings. The trial resumed after the voir dire 
examination of the officers, with the State continuing its cross-examination of 
Appellant.
        During 
the course of the trial, on three occasions, the trial court sustained defense 
counsel’s objections that the State was impermissibly commenting on 
Appellant’s post-arrest silence. First, during the State’s direct 
examination of crime scene officer Cheryl Johnson, the prosecutor asked her, 
“When you met with [Appellant] Swanda Wiley, is that the name that she was 
giving you then?” Defense counsel objected under article 38.08 of the code of 
criminal procedure; article 1, section 10 of the Texas Constitution; and the 
Fifth and Fourteenth Amendments to the United States Constitution, and the trial 
court sustained the objection. Defense counsel did not, however, request a jury 
instruction or move for a mistrial.
        Second, 
during the State’s cross-examination of Appellant, the following exchange 
occurred:
 
Q. Did you ever tell the 911 operator [Kenneth Wiley] had been raping [you], he 
had been attacking [you]?
 
A. 
No.
Q. 
In fact, you never told any law enforcement about the rape?
 
[DEFENSE]: 
Objection, Your Honor, as to the violation of 38.08, Article One, Section Ten of 
the Texas Constitution and the Fifth and Fourteenth Amendments of the United 
States Constitution.

This 
time, the trial court sustained Appellant’s objection and gave an instruction 
to disregard, but denied Appellant’s motion for mistrial.
        On 
the next morning of trial, the trial court, for a third time, sustained an 
objection by defense counsel based on the State commenting on Appellant’s 
silence when the prosecutor asked her:
 
Q. After speaking with [Detective] John McCaskill on August 10th of 
the year 2000, did you have occasion to learn the next day, on August 11th 
of the year 2000, John McCaskill wanted to speak with you again?
 
A.     Yes.
 
Q. 
And you denied him opportunity to speak --
 
[DEFENSE]: 
Objection, Your Honor. . . . Article 1 Section 10 of the Texas Constitution, 
Fifth and Fourteenth Amendments of the United States Constitution, Article 38.08 
of the Texas Code of Criminal Procedure, for all those reasons, Your Honor, 
object to that last question.
 
The 
trial court sustained the objection, instructed the jury to disregard, and 
granted Appellant’s motion for a mistrial.
        Appellant 
then filed an application for a writ of habeas corpus, claiming that a 
subsequent trial regarding this offense was barred by double jeopardy 
provisions. On April 4, 2002, the trial court held a hearing on Appellant’s 
application, with the same judge presiding over the habeas proceeding as had 
presided over the trial. Appellant offered the trial transcript as evidence and 
rested. The State offered a bill of exceptions, and the prosecutor took the 
stand to testify to the basis for the questions he had asked Appellant at trial. 
The prosecutor testified that his purpose was to “shore her up on prior 
inconsistent statements” and that he had not been “trying to recklessly, 
intentionally or knowingly goad the defense to having to move for a mistrial.” 
At the conclusion of the hearing, the trial court denied Appellant’s request 
for habeas relief. Appellant appealed to this court and we reversed and rendered 
judgment dismissing the case with prejudice. The court of criminal appeals 
granted the State’s petition for review.
        Following 
our decision in Lewis, the court of criminal appeals issued its opinion 
in Ex parte Peterson. In Peterson, the court of criminal appeals 
set out the following three-pronged analysis to be employed by courts in 
analyzing a double jeopardy mistrial claim:
 
(1) Did manifestly improper prosecutorial misconduct provoke the mistrial?
 
(2) 
Was the mistrial required because the prejudice produced from that misconduct 
could not be cured by an instruction to disregard? And
 
(3) 
Did the prosecutor engage in that conduct with the intent to goad the defendant 
into requesting a mistrial (Kennedy standard) or with conscious disregard 
for a substantial risk that the trial court would be required to declare a 
mistrial (Bauder standard)?
 
117 
S.W.3d at 816-17.
        The 
court of criminal appeals remanded to this court for reconsideration in light of 
its holding in Peterson.
STANDARD OF REVIEW
        When 
raising a double jeopardy claim on a pretrial writ of habeas corpus, the 
applicant bears the burden of proof under a preponderance of the evidence 
standard. Id. at 818. Therefore, Appellant must satisfy all three prongs 
of the analysis set out above. Id. In reviewing the trial court’s 
decision to grant or deny habeas relief, we must review the facts in the light 
most favorable to the trial judge’s ruling and should uphold the decision 
absent an abuse of discretion. Id. at 819. We should afford almost total 
deference to a trial court's determination of the historical facts that the 
record supports, especially when the trial court's fact findings are based on an 
evaluation of credibility and demeanor. Id. We also afford that same 
level of deference to a trial court's ruling on application of law to fact 
questions, also known as mixed questions of law and fact, if the resolution of 
those ultimate questions turns on an evaluation of credibility and demeanor. Id. 
But appellate courts review de novo those mixed questions of law and fact that 
do not depend upon credibility and demeanor. Id. Although reviewing 
courts should also grant deference to “implicit factual findings” that 
support the trial court's ultimate ruling, they cannot do so if they are unable 
to determine from the record what the trial court's implied factual findings 
are. Id.
ANALYSIS
A. Did 
manifestly improper prosecutorial misconduct provoke the mistrial?
        Conduct 
is not manifestly improper if it is the result of inadvertence, sloppiness, or 
even simple negligence. Id. at 817. A prosecutor's blunder that 
precipitates a successful motion for mistrial does not bar a retrial. Id. 
Prosecutorial misconduct reasonably reaches only that conduct which is 
qualitatively more serious than simple error and connotes an intentional 
flouting of known rules or laws. Id. at 816 n.55. If the prosecutor's 
conduct, viewed objectively, was not manifestly improper, then the double 
jeopardy inquiry ends at this first stage. Id. If, for example, the law 
itself is unsettled or the application of the law in the particular situation is 
debatable, the prosecutor's conduct cannot be said to be manifestly improper. Id.
        Appellant 
argues that this first prong has been satisfied because the prosecutor, on three 
separate occasions, attempted to comment on Appellant’s post-arrest silence. 
Appellant also points to the trial court’s admonition to the prosecutor that 
his global attempts to impeach Appellant were improper. The State counters that 
the prosecutor’s conduct does not rise to the level of prosecutorial 
misconduct and should instead be characterized as simple trial error.
        The 
State, in arguing that the prosecutor’s conduct does not rise to the level of 
prosecutorial misconduct, contends that two of the questions by the prosecutor 
were not improper comments on Appellant’s silence and thus, objections to 
these questions should not have been sustained. The first occurred during the 
direct-examination of Officer Johnson when she was asked if Appellant had stated 
her name was Swanda Wiley. The State argues that this question did not imply 
silence, but rather implied that Appellant had given a name to officers.
        Questioning 
normally attendant to arrest and custody is not interrogation. McCambridge v. 
State, 712 S.W.2d 499, 505 (Tex. Crim. App. 1986). Asking a person his name, 
address, and telephone number is not interrogation protected by the Fifth 
Amendment because it is not likely to elicit an incriminating response. Massie 
v. State, 744 S.W.2d 314, 317 (Tex. App.—Dallas 1988, pet. ref’d). 
Accordingly, the prosecutor’s question to Officer Johnson regarding the name 
provided by Appellant was not an improper comment on her silence. Thus, this 
question was not objectionable.
        The 
second question the State argues was not an impermissible comment on 
Appellant’s silence occurred during cross-examination of Appellant, when she 
was asked, “In fact, you never told any law enforcement about the rape?” The 
State argues that Appellant opened the door to questions about what she told the 
police because she testified on direct-examination that she told detectives 
“the same thing I’m telling you,” which included an allegation that Wiley 
had raped her. The State contends that the prosecutor’s question on 
cross-examination was a proper inquiry into the fact that she did not tell the 
police that she had been raped. We disagree.
        At 
the point in the trial when this question was asked, there was no evidence 
showing that Appellant had made a prior inconsistent statement. Although 
Appellant admitted on direct examination that she had made a statement to a 
detective, no statement had yet been admitted into evidence. The prosecutor’s 
first attempt to show inconsistency was with the question, “In fact, you never 
told any law enforcement about the rape?” As we discuss below, without any 
evidence that her prior statement was in fact inconsistent, this question goes 
directly to Appellant’s silence.
        Absent 
a showing of actual inconsistency, post-arrest silence is not probative as 
evidence of prior inconsistent conduct; therefore, impeachment through the use 
of such evidence is improper. Sanchez v. State, 707 S.W.2d 575, 582 (Tex. 
Crim. App. 1986); see Turner v. State, 719 S.W.2d 190, 193 (Tex. Crim. 
App. 1986) (holding that it was error to permit State to cross-examine defendant 
regarding post-arrest silence without first establishing that defendant had made 
an inconsistent statement). In Turner, the court of criminal appeals 
stated:
 
In his cross-examination, the attorney for the State referred to the time 
following the arrest of the appellant (“while on bond”) when he asked the 
appellant if he had told “any law enforcement officer” about his alibi.  
The attorney for the State never proved that the appellant made a statement 
during that time which was actually inconsistent with the alibi he offered as a 
defense at trial.  The trial court erred in permitting the attorney for the 
State to cross-examine the appellant regarding his post-arrest silence, without 
first establishing that appellant made an inconsistent statement during that 
time.
 

719 
S.W.2d at 193 (footnote omitted); see also Hampton v. State, 121 S.W.3d 
778, 782-84 (Tex. App.—Austin 2003, pet. ref’d) (holding it was error to 
allow State to use defendant’s post-arrest silence against him “by 
demonstrating to the jury that he had never told the investigating officer or 
any sheriff’s deputy the exculpatory theory he related from the witness 
stand”); Veteto v. State, 8 S.W.3d 805, 813 (Tex. App.—Waco 2000, 
pet. ref’d) (finding State’s inquiry into defendant’s post-arrest silence 
was improper because State had not established an actual inconsistent position 
taken by defendant prior to asking about post-arrest silence).
        Because 
the State did not establish an actual inconsistent position between what 
Appellant testified to at trial and any statement made following her arrest, it 
was error for the State to attempt impeachment through Appellant’s post-arrest 
silence. Thus, the trial court was correct in sustaining Appellant’s objection 
and instructing the jury to disregard the question.
        Likewise, 
the last objected to question, “And you denied him opportunity to speak—“ 
was also an improper question that implicated Appellant’s post-arrest silence. 
In its brief, the State does not attempt to justify this question and readily 
concedes that it was improper. We must now decide whether the questions 
precipitating these two properly sustained objections amounted to manifestly 
improper prosecutorial misconduct.
        The 
United States Constitution prohibits the use of a defendant’s post-arrest, 
post-Miranda silence for impeachment purposes. Fletcher v. Weir, 
455 U.S. 603, 607, 102 S. Ct. 1309, 1312 (1982). Texas goes further and provides 
protection against the use of a defendant’s post-arrest, pre-Miranda 
silence for impeachment. Sanchez, 707 S.W.2d at 582. The court of 
criminal appeals in Sanchez recognized two rationales for this greater 
protection. Id. at 578. First, such use would violate the accused's right 
to be free from compelled self-incrimination under article I, section 10 of the 
Texas Constitution. Id. Second, rules relating to impeachment prohibit 
the use of such evidence since post-arrest silence is not probative as prior 
inconsistent conduct. Id.
        It 
is a well-established rule that an individual's post-arrest silence may not be 
used against him at trial. Lewis v. State, 933 S.W.2d 172, 182 (Tex. 
App.—Corpus Christi 1996, pet. ref’d); see Doyle v. Ohio, 426 
U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976); Dinkins v. State, 894 S.W.2d 
330, 356 (Tex. Crim. App.), cert. denied, 516 U.S. 832 (1995); Cuellar 
v. State, 613 S.W.2d 494, 495 (Tex. Crim. App. 1981). Indeed, during the 
writ hearing, the prosecutor acknowledged that he was “well aware of the 
governing principles behind the right to remain silent.” Yet, he twice 
impermissibly attempted questions that went directly to Appellant’s 
post-arrest silence. This action resulted in two sustained objections, two 
curative instructions, a prior motion for mistrial, and finally a declaration of 
a mistrial.
        The 
law regarding the use of post-arrest silence is not unsettled, nor is the 
application of the law in this situation debatable. See Peterson, 117 
S.W.3d at 816 n.55 (noting that the prosecutor’s conduct cannot be manifestly 
improper if, for example, the law itself is unsettled or the application of the 
law in the particular situation is debatable). Therefore, based on the record, 
we conclude that the prosecutor’s conduct amounted to more than simple trial 
error. Compare Veteto, 8 S.W.3d at 813 (concluding it was reversible 
error to deny defendant’s motion for mistrial where State had not established 
an actual inconsistent position and State persistently pursued improper line of 
questioning after trial court sustained first objection), with Lewis, 
933 S.W.2d at 182 (refusing to hold prosecutor’s action rose to misconduct 
where prosecutor asked one question regarding defendant’s post-arrest silence 
and did not continue in an impermissible line of questioning after objection and 
instruction to disregard). Thus, we hold that manifestly improper prosecutorial 
misconduct did provoke the mistrial.
 
B. Was the mistrial required because the prejudice produced from that misconduct 
could not be cured by an instruction to disregard?
 
        In 
Peterson, the court of criminal appeals explained that the proper inquiry 
is whether Appellant was “required to move for a mistrial because the 
prosecutor deliberately or recklessly crossed the line between legitimate 
adversarial gamesmanship and manifestly improper methods that rendered trial 
before the jury unfair to such a degree that no judicial admonishment could have 
cured it[.]” 117 S.W.3d at 816 (quoting Ex parte Bauder, 974 S.W.2d 
729, 732 (Tex. Crim. App. 1998)).
        The 
asking of an improper question will seldom call for a mistrial because, in most 
cases, any harm can be cured by an instruction to disregard. Ladd v. State, 
3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is required only when the 
improper question is clearly prejudicial to the defendant and is of such 
character as to suggest the impossibility of withdrawing the impression produced 
on the minds of the jurors. Id. Potential prejudice resulting from a 
question concerning post-arrest silence might be cured by an instruction to 
disregard. Johnson v. State, 83 S.W.3d 229, 231 (Tex. App.—Waco 2002, 
pet. ref’d); see Dinkins, 894 S.W.2d at 356; Waldo v. State, 
746 S.W.2d 750, 754 (Tex. Crim. App. 1988). We defer to the trial court’s 
conclusion on whether an instruction to disregard would have cured the problem. See 
Bowen v. State, 131 S.W.3d 505, 509 (Tex. App.—Eastland 2004, pet. ref’d). 
Moreover, the trial judge is in the unique position of being able to observe the 
reaction of the jury and gauge the impact of an improper question or argument. See 
Ex parte Bruce, 112 S.W.3d 635, 641 (Tex. App.—Fort Worth 2003, pet. 
dism’d, untimely filed) (finding that trial judge did not abuse discretion in 
declaring mistrial because he was in best position to observe reaction of jurors 
to improper statement during opening argument of defense counsel and could 
determine if jury would be biased by statement).
        The 
effectiveness of a curative instruction is determined on a case-by-case basis. Johnson, 
83 S.W.3d at 232. Although not specifically adopted as definitive or exhaustive, 
courts have looked to several factors to determine whether an instruction to 
disregard cured the prejudicial effect, including: 1) the nature of the error; 
2) the persistence of the prosecution in committing the error; 3) the flagrancy 
of the violation; 4) the particular instruction given; 5) the weight of the 
incriminating evidence; and 6) the harm to the accused as measured by the 
severity of sentence. Waldo, 746 S.W.2d at 754; Johnson, 83 S.W.3d 
at 232; Fletcher v. State, 852 S.W.2d 271, 275 (Tex. App.—Dallas 1993, 
pet. ref’d). Thus, we will consider these factors in the present case.
Nature of the Error
        Although 
the nature of the error is not such that an instruction can never cure it, a 
question infringing on Appellant’s constitutionally protected rights is 
serious in nature. Johnson, 83 S.W.3d at 232. However, the court of 
criminal appeals has stated regarding comment on the failure to testify:
  
the . . . presumption that an instruction [to disregard] generally will not cure 
comment on failure of the accused to testify . . . has been eroded to the point 
that it applies only to the most blatant examples.  Otherwise, the Court 
has tended to find the instruction to have force.  Even where we have found 
such comment beyond cure, the Court has nevertheless held it can constitute 
harmless error in context of the particular case.
 
Dinkins, 
894 S.W.2d at 356.
        Clearly, 
the court has found that although a comment on an accused’s right to remain 
silent is serious, the presumption remains that generally, an instruction to 
disregard is sufficient to cure the error. Furthermore, Appellant’s counsel 
objected before she could answer the question, supporting the presumption that 
an instruction to disregard would be effective in curing the error. See Hyett 
v. State, 58 S.W.3d 826, 832-33 (Tex. App.—Houston [14th Dist.] 2001, pet. 
ref’d) (holding that instruction to disregard was effective where witness 
never answered question regarding defendant’s post-arrest silence). Therefore, 
we hold that this factor weighs in favor of the State.
Flagrancy and Persistence
        In 
this instance, the prosecutor twice asked Appellant questions that went directly 
to her failure or refusal to speak to law enforcement. The prosecutor’s 
improper questions received two sustained objections, two instructions to 
disregard, and one prior denial of a motion for mistrial. Moreover, as the 
prosecutor himself admitted, he was well aware that the use of post-arrest 
silence is impermissible, and yet he chose to disregard a prior sustained 
objection and instruction to disregard in pursuing this impermissible line of 
questioning. Therefore, we hold that the prosecutor flagrantly and persistently 
pursued this improper line of questioning. See Veteto, 8 S.W.3d at 811 
(concluding that the State was persistent and flagrant by inquiring into 
post-arrest silence on three occasions); Mendoza v. State, 959 S.W.2d 
321, 324-25 (Tex. App.—Waco 1997, pet. ref’d) (holding that prosecutor 
persistently and flagrantly pursued post-arrest silence when he ignored the 
court’s first ruling and repeated the question in a different form); cf. 
Johnson, 83 S.W.3d at 232 (holding State was neither persistent nor 
flagrant when it did not repeat improper question concerning post-arrest 
silence); Fletcher, 852 S.W.2d at 275 (concluding that one question 
concerning defendant’s failure to provide written statement to detective was 
neither flagrant nor persistent). Thus, these factors weigh in favor of 
Appellant.
Particular Instruction Given
        In 
analyzing the particular instruction given, it is necessary to look at each 
instruction separately. Veteto, 8 S.W.3d at 811. After the first 
objection during Appellant’s cross-examination, the trial judge instructed the 
jury, “You’ll disregard the last question by the prosecutor.” After the 
second objection the trial judge instructed the jury, “You-all are instructed 
to disregard the last statement by counsel regarding the defendant talking to 
the police.” Similar instructions have been held adequate. See Waldo, 
746 S.W.2d at 755 (“Jury is instructed to disregard the last comment of the 
witness.”); Johnson, 83 S.W.3d at 232 (“Ladies and gentlemen, please 
disregard the last question by the prosecutor.”); Sands v. State, 64 
S.W.3d 488, 492 (Tex. App.—Texarkana 2001, no pet.) (“Ladies and gentlemen, 
disregard the last question and answer and don't consider it for any 
purpose.”); Hardin v. State, 20 S.W.3d 84, 92 (Tex. App.—Texarkana 
2000, pet. ref’d) (“The jury is instructed to disregard the question. There 
is no answer to it. Completely disregard it.”). We likewise conclude that the 
instruction given in this instance was adequate. Thus, this factor weighs in 
favor of the State.
Weight of the Incriminating Evidence
        Appellant 
testified that the gun discharged while struggling with Wiley, but she stated 
she did not intend to pull the trigger and did not know how the gun discharged. 
On cross-examination, the State had Appellant demonstrate in detail how she and 
Wiley were positioned during their struggle. While the testimony of this 
demonstration is somewhat confusing, it suffices to say that it appears the 
State was attempting to contradict Appellant’s version of the events by 
showing that Wiley’s entry wound was inconsistent with Appellant’s 
description of where he was when the gun discharged. In fact, Appellant admitted 
that she could not explain how the deceased was struck by the bullet based on 
her demonstration.
        Further, 
Appellant testified that Wiley fell to the floor after being shot, but this was 
contradicted by the responding EMT who testified that she found the deceased 
seated on the couch. Additionally, the medical examiner testified that the 
bullet entered in the back of the victim’s head at the base of his skull and 
the “muzzle was in loose contact with the skin of the back of his head when it 
was fired.” On cross-examination, the medical examiner stated that he could 
not exclude that the wound could also be consistent with Appellant’s version 
of the events that the gun discharged during a struggle, but that was contingent 
on meeting the “angle” and “range of fire.” However, on redirect, the 
medical examiner stated the injury was also consistent with the theory that the 
deceased was already sitting on the sofa when he was shot unsuspectingly in the 
back of the head.
        Therefore, 
based on the record and the nature of the testimony, we conclude that 
Appellant’s credibility would most likely weigh heavily on the jury’s minds 
when considering her explanation of the events. Thus, attempts by the State to 
point out specific instances when she failed to speak or relate a certain fact 
to law enforcement could have heavily influenced the jury in judging her 
credibility. Thus, we cannot conclude that the weight of the evidence overcomes 
the potential prejudice from these improper questions going to Appellant’s 
silence. See Veteto, 8 S.W.3d at 812 (concluding that because evidence of 
defendant’s guilt was not overwhelming, the inference to his silence could 
have been considered by the jury as evidence of his guilt). Thus, this factor 
weighs in favor of Appellant.
Harm to the Appellant as Measured by the Severity of 
Sentence
        Because 
the motion for mistrial was granted, this factor is inapplicable.
Summary of Factors
        After 
considering each of the above factors, we hold that the flagrancy of the error, 
the persistence of the prosecutor in attempting to question Appellant regarding 
her silence, and the potential prejudice on Appellant’s credibility in light 
of the evidence and testimony presented, was such that an instruction to 
disregard would not have effectively cured the misconduct. Therefore, the 
mistrial was required.
 
C. Did the prosecutor engage in that conduct with the intent to goad the 
defendant into requesting a mistrial or with conscious disregard for a 
substantial risk that the trial court would be required to declare a mistrial?
 
        This 
third prong is the most problematic. Peterson, 117 S.W.3d at 817. Trial 
and appellate courts should focus primarily upon the objective facts and 
circumstances surrounding the events that led to the mistrial in deciding 
whether the prosecutor’s alleged misconduct was committed with the requisite 
intent or recklessness. Id. at 818. The court of criminal appeals 
provided some factors for trial and appellate courts to consider in assessing 
the prosecutor’s mens rea, including:
 
1) Was the misconduct a reaction to abort a trial that was “going badly for 
the State”?  In other words, at the time that the prosecutor acted, did 
it reasonably appear that the defendant would likely obtain an acquittal?
 
2) 
Was the misconduct repeated despite admonitions from the trial court?
 
3) 
Did the prosecutor provide a reasonable, “good faith” explanation for the 
conduct?
 
4) 
Was the conduct “clearly erroneous”?
 
5) 
Was there a legally or factually plausible basis for the conduct, despite its 
ultimate impropriety?
 
6) 
Were the prosecutor's actions leading up to the mistrial consistent with 
inadvertence, lack of judgment, or negligence, or were they consistent with 
intentional or reckless misconduct?
 
Id. 
at 818-19.
Was the Trial Going Badly for the State?
        The 
State argues that the prosecutor in this case believed that the case was going 
well for the State. The State contends that the case was formidable against 
Appellant because she had multiple motives for murder, including rape, A.I.D.S., 
and abandonment, she admitted pulling the trigger, and the medical examiner’s 
description of the gunshot wound severely undermined Appellant’s version that 
the shooting occurred during a struggle while Wiley was holding Appellant in a 
bear hug from behind. The State also points to the testimony of the prosecutor 
at the writ hearing, where he stated,
  
I felt this case was extremely strong against this defendant.  In no way 
was I trying to recklessly, intentionally or knowingly goad the defense to 
having to move for a mistrial because it was the State’s position that the 
case was going extremely well from the day before and the day of, and that the 
defendant, with all of the evidence that was presented in the case, was guilty 
up to that point and then it was going to further it through the impeachment via 
the two officers.
 
        Despite 
the State’s contention that the “case against Appellant was formidable,” 
we believe the record reveals a different story. During its case-in-chief, the 
State called as witnesses a woman who claimed to have overheard Appellant in 
jail say she shot her husband, the responding paramedic, the medical examiner, 
and Wiley’s brother, none of whom witnessed Wiley’s death. Moreover, the 
State failed to present the testimony of either the responding officer or the 
detective, nor did it attempt to introduce the statements made by Appellant to 
these officers.
        Although 
Appellant did testify, she stated she did not know how the gun discharged during 
a struggle with the victim. The record demonstrates that the State attempted to 
contradict Appellant’s version of events and Appellant was unable to explain 
exactly how the victim was shot in the back of the head. Additionally, the 
medical examiner testified that the gunshot wound could have occurred as 
Appellant described, but it was also consistent with the theory that someone 
came up behind the victim as he was sitting on the couch and shot him in the 
back of the head.
        At 
the time that the mistrial was granted, the State was attempting to impeach 
Appellant with what the State believed to be inconsistencies between 
Appellant’s trial testimony and statements provided to law enforcement. Based 
on the prosecutor’s bill of exceptions and testimony at the writ hearing, it 
appears that the prosecutor realized there was evidence, the statements made to 
law enforcement, that he should have presented during his case-in-chief. 
Consequently, the prosecutor was attempting to impeach Appellant in order to 
have the ability to introduce the statement she provided to Detective McCaskill 
into evidence through rebuttal. Therefore, it is apparent from the record that 
the prosecutor believed it was imperative to his case that he be able to bring 
this prior statement into evidence to dispute Appellant’s trial testimony. 
Thus, given the nature of the evidence introduced by the State at the point the 
mistrial was granted, we conclude that the case was going badly for the State.
Misconduct Repeated Despite Admonition?
        The 
State contends that there was only one improper question, as the other two were 
not objectionable. However, we have concluded that two of the prosecutor’s 
three questions went directly to Appellant’s silence and have detailed that 
the trial court properly sustained two objections and gave two curative 
instructions to the jury before granting the mistrial. Thus, the misconduct in 
asking the second improper question was repeated despite the trial court’s 
admonition after the first improper question.
Reasonable, “Good Faith” Explanation?
        The 
prosecutor testified at the writ hearing regarding his intent in asking his last 
question, “And you denied him opportunity to speak—“:
  
The subjective intent for doing that was simply for impeachment purposes.  
Being well aware of the right, Fifth Amendment rights under the State and the 
Federal Constitution, it was nowhere near the purpose of complying [sic] silence 
as any evidence of guilt against the defendant.  It was shoring her up on 
prior inconsistent statements.
 
                . 
. . .
 
. 
. . Over and over again I’ve stated that it was used . . . to elicit an 
explanation for a prior inconsistent statement. In no way, shape or form was the 
State trying to imply anything other than the fact that she gave a prior 
inconsistent statement.
 
        Upon 
questioning by Appellant’s counsel, the following exchange took place:
 
Q. Reading back to my question, where in the record did she ever say anything at 
all, make any kind of statement prior to that about his tactics?
 
A. 
Nothing from her mouth, no.
Q. 
Okay. And you did intend to bring out that she said she wasn’t going to talk 
to him because of his tactics?
 
A. 
She denied him an opportunity to speak by stating the words I know what tactics 
you used.
 
Q. 
Did you not say that you intended in your own affidavit to bring out that she 
denied him the opportunity— or told him she wasn’t going to talk to him 
because she knew his tactics?
 
A. 
I just quoted, yes, but not in those exact words.
Q. 
And that was your subjective intent, that was your full intent, was it not, to 
bring out that she told him she wasn’t going to talk to him because of his 
tactics?
 
A. 
She denied him opportunity to speak by stating the words, quote, “I know what 
tactics you used.”  Unquote, yes.
 
                . 
. . .
Q. 
The words that were stated, you didn’t need to bring up her silence, did you?
 
A. 
Didn’t say anything about silence.
Q. 
You said you wouldn’t talk to him?
A. 
Denied him an opportunity to speak by stating the words, I know what tactics you 
use. It is not an impeachment with silence, it is a prior inconsistent statement 
shoring up what was going on.
  
        
In addition to his testimony at the writ hearing, the prosecutor also entered a 
bill of exceptions into evidence that also explained his rationale for the last 
question posed to Appellant. It states:
         
The State will further show, if able to make a part of the court reporter’s 
record, that:
 
-Detective 
John McCaskill gave the defendant an opportunity to explain or deny any 
inconsistencies on 8-11-00, concerning information provided by the defendant on 
8-10-00;
 
-the 
State would make no references to the arrest of the defendant, nor that she was 
in custody at the time of the 8-11-00 attempted interview;
 
-upon 
being given the opportunity on 8-11-00, the defendant denied the request to 
speak with Detective John McCaskill by stating, “I know what tactics you 
use”
   
        We 
conclude from our review of the record that the prosecutor was intent on 
bringing before the jury the fact that Appellant had exercised her right to 
remain silent. Given every opportunity to explain and justify the basis of his 
last question, the prosecutor consistently and unequivocally pointed to and 
commented on Appellant’s refusal to speak again with Detective McCaskill.
        Moreover, 
we fail to understand the probativeness of the question going to Appellant’s 
denial of Detective McCaskill’s request to speak with her.  Appellant 
provided a statement to Detective McCaskill on August 10, 2000 and declined to 
speak with him on August 11, 2000, allegedly just stating, “I know what 
tactics you use.”  However, there is no allegation in the record by 
Appellant that she was coerced in any manner in providing a statement on August 
10.  Therefore, other than to allow the State the opportunity to point to 
the fact that Appellant chose not to speak with the detective, we fail to see 
any evidentiary value in this possible statement regarding “tactics.”
        The 
only relevant statement was provided by Appellant on August 10 when she gave her 
version of the events to Detective McCaskill and it is this statement that would 
be used to point to any inconsistencies in Appellant’s trial testimony.  
In fact, the prosecutor stated in his bill of exceptions that he planned on 
asking Appellant “to explain any inconsistencies as to what she testified to 
under oath and what she said on [August 10, 2000].”  Consequently, we 
fail to understand the reasoning of the prosecutor in asking Appellant about her 
refusal to speak on August 11, 2000.
        We 
conclude that the prosecutor’s explanation is not reasonable or in “good 
faith.”  If the prosecutor wished to impeach Appellant with her prior 
statement about the detective’s “tactics,” he did not need to comment on 
the fact that she “denied him an opportunity to speak.”  Regardless of 
how it was phrased, this question went directly to Appellant’s assertion of 
her right to remain silent and, thus, was an improper comment on her post-arrest 
silence.  Moreover, the prosecutor did not offer any explanation for his 
first improper comment on Appellant’s silence.  As the prosecutor was 
admittedly “well aware of the governing principles behind the right to remain 
silent,” we are unable to understand why he would twice intrude into this 
constitutionally protected area.  See Johnson, 83 S.W.3d at 232 
(“We have nothing to explain why a prosecutor would depart from the 
established rules and question a defendant about his post-arrest silence.”).  
Although the prosecutor could undoubtedly impeach Appellant with a prior 
inconsistent statement, we can think of no logical reason why he would need to 
comment on the fact that she had declined to speak with law enforcement.  
Therefore, we must conclude that the prosecutor did not provide a reasonable, 
“good faith” explanation for his conduct.
Conduct Clearly Erroneous?
        As 
the constitutional protections provided to an accused’s right to remain silent 
are well established, the prosecutor’s questions regarding Appellant’s 
post-arrest silence were clearly erroneous.  See Doyle, 426 U.S. at 
619, 96 S. Ct. at 2245 (holding use of defendant’s post-arrest, post-Miranda 
silence for impeachment violated Due Process Clause of Fourteenth Amendment); Sanchez, 
707 S.W.2d at 582 (holding that a defendant may not be impeached by post-arrest, 
pre-Miranda silence).  But see State v. Lee, 15 S.W.3d 921, 
925-26 (Tex. Crim. App. 2000) (holding that prosecutor’s comment on 
defendant’s pre-arrest, pre-Miranda silence was not clearly erroneous 
as the prosecutor had a legitimate view of the law, given the fact that this 
area of the law had not been addressed by the United States Supreme Court or the 
court of criminal appeals).
Legally or Factually Plausible Basis for Conduct?
        The 
State contends that the prosecutor did have a plausible basis for his conduct.  
It argues that the prosecutor was intending to impeach Appellant, but in his 
haste, the prosecutor trod into the area of commenting on her silence.  
While it is apparent from the record that the prosecutor was attempting to 
impeach Appellant with a prior inconsistent statement, no inconsistencies had 
been shown between her trial testimony and a prior statement, as there was no 
prior statement in evidence at that point.  As we have stated, although the 
prosecutor undoubtedly could have impeached Appellant with a prior inconsistent 
statement, there is no plausible reason why he would need to persistently 
comment on the fact that she had declined to speak to law enforcement.  At 
the point the mistrial was granted, her prior silence was improper impeachment 
evidence and should never have been commented on.  Therefore, we conclude 
that there was no legally or factually plausible basis for the prosecutor’s 
conduct.
Prosecutor’s Actions Leading Up To Mistrial?
        The 
State claims the prosecutor was negligent in his conduct, but this negligence 
did not rise to prosecutorial misconduct.  Appellant counters that the 
error was so flagrant, that if not intentional, it “surely was grossly 
reckless.”
        Up 
until the trial court declared a mistrial, the prosecutor, in the face of two 
properly sustained objections, two curative instructions, and a prior motion for 
mistrial, repeatedly attempted to use Appellant’s silence in an improper 
manner.  As the prosecutor consistently maintained, his desire in asking 
his last question was to point to the fact that Appellant “denied the request 
to speak with Detective McCaskill by stating, ‘I know what tactics you 
use.’”  Inherent in this question is a comment on Appellant’s 
constitutionally protected right to remain silent.  Further, this came 
after he had clearly infringed on her silence by his earlier question, “In 
fact, you never told any law enforcement about the rape?”
        “[J]ust 
as a dog knows the difference between being kicked and being stumbled over, 
judges can distinguish between intentional or reckless misconduct and 
inadvertent or negligent mistakes.”  Peterson, 117 S.W.3d at 818.  
Accordingly, given the prosecutor’s admitted familiarity with the 
constitutional safeguards concerning the use of an accused’s post-arrest 
silence, we conclude that his actions leading up to the mistrial were consistent 
with intentional or reckless misconduct.
Summary of Factors
        Given 
our analysis of the above factors relevant to the prosecutor’s mens rea, 
we hold that the prosecutor, at the least, engaged in this conduct with 
conscious disregard for a substantial risk that the trial court would be 
required to declare a mistrial.
CONCLUSION
        After 
applying the analysis established in Peterson, we hold that the trial 
court abused its discretion by denying Appellant’s application for writ of 
habeas corpus.  Because double jeopardy bars a second prosecution of 
Appellant for murder, we reverse the order of the trial court and render 
judgment granting the relief sought in the application for writ of habeas corpus 
and dismissing the case with prejudice.  Tex. R. App. P. 43.2(c).
 
 
                                                          ANNE 
GARDNER
                                                          JUSTICE
 
 
PANEL 
B: DAUPHINOT, GARDNER, and WALKER, JJ.
 
PUBLISH
 
DELIVERED: 
March 10, 2005

 
NOTES
1.  
During the medical examiner’s cross-examination, he testified that the 
trajectory of the ball from the bullet was “slightly upward and slightly from 
left to right,” and he agreed that the bullet did not go through the entire 
skull.