

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-21-00087-CR

---

PRENTIS EARL SMITH II, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. F14990

---

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice Stevens

# MEMORANDUM OPINION

A Marion County jury found Prentis Earl Smith II guilty of the murder of Freddy Thomas. Following the jury's recommendation, the trial court sentenced Smith to seventy-five years' confinement in prison. On appeal, Smith argues that the trial court erred by (1) allowing the State's medical expert to testify in violation of the Confrontation Clause, (2) allowing the State's forensic medical expert to testify despite insufficient notice, (3) admitting autopsy photographs over his hearsay objection, (4) admitting evidence of an unadjudicated extraneous offense, (5) allowing the State's toxicology expert to testify about the results of her testing, and (6) overruling Smith's Confrontation Clause objection to the testimony of the State's toxicologist.

Because we find that (1) the forensic expert's testimony did not violate the Confrontation Clause, (2) the trial court did not abuse its discretion in allowing the untimely disclosed witness to testify, (3) the autopsy photographs were not hearsay, (4) even if erroneous, admission of evidence of an extraneous offense was harmless error, (5) allowing the toxicology expert to testify was not error, and (6) the toxicology expert's testimony did not implicate the Confrontation Clause, we affirm the trial court's judgment.

## I. Background

On May 7, 2018, Pamela Goynes called the Marion County Sheriff's Department several times, asking them to perform a welfare check on her husband, Smith, because she believed that he might be sick. Sheriff David McKnight and an ambulance arrived at Smith's home to check on him. McKnight testified that, at the time, Smith seemed agitated, annoyed, and incoherent.

Smith told McKnight that "Freddy" was in his house and that he had a gun. McKnight believed "Freddy" to be one of Smith's known acquaintances, Freddy Thomas. McKnight and Deputy Frank Cason entered and searched the house, finding a handgun, a large pool of blood, and an overturned sofa that was partially on top of Thomas's body. The gun was located "fairly near" to Thomas. Upon realizing that Thomas was still alive, he was transported to a hospital. Even so, Thomas died three days later.

McKnight read Smith his *Miranda*[1] warnings and asked him about the events leading up to the shooting. Smith told McKnight that someone was putting drugs in his milk and the well water on his property. Smith also mentioned that Thomas had been trying to sell him a Taurus .380 handgun, the same gun found in the house. Smith said that, prior to confronting Thomas, he had gone into his bedroom to put on his shoes and "fighting attire." When McKnight asked Smith if he shot Thomas, Smith responded, "More than likely I did."

When the police found Thomas in Smith's house, he had both the gun and a knife near him, and he had a crack pipe in one hand. McKnight said it was a "fair assumption" that Thomas had ingested crack at some point. Knowing that people who smoke crack can be dangerous because it causes "[p]aranoia, agitation, . . . incoherence, [and] high energy," McKnight was "sure" that Thomas would have been a "difficult person to deal with if he was high on crack."[2]

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]McKnight testified about the various interactions he had had with Thomas in the past. He said Thomas was a man that could "pick a fight," as he was "cankerous" and "assaultive" in nature. From McKnight's experience, Thomas had "probably" threatened people in the past, and if he had threatened to kill others, it would not be a surprise to McKnight. Cason also confirmed that he had prior interactions with Thomas. He believed that Thomas could be difficult to deal with at times. Cason testified that it was possible that Thomas could have been on crack, brought a gun to Smith's house, and then threatened him.

According to Cason, Smith did not "remember everything, but he did remember seeing the gun and remembered shooting [Thomas]." Smith told Cason that Thomas "went for the backpack" that had the gun in it, and Smith "went for [Thomas]." Smith also said that Thomas had threatened to kill him. When Cason asked Smith how many times he had shot the gun, Smith said, "I shot, I shot, I asked him to stay down, and I shot low." Smith said that Thomas was still "talking shit," so he shot once more and then did not "remember anything else." Cason testified that there was some coagulation of the blood found on the floor and sofa, indicating that some time had passed after the blood got there. Because there was blood on the bottom of the sofa, Cason believed that Thomas had been sitting on the sofa at the time or after he was shot.

Cason later obtained text messages from Goynes's phone regarding a conversation between her and Smith. The conversation occurred between 6:21 a.m. and 8:46 a.m. on the morning of the shooting. The texts from Smith stated that he was "real scared," that he could not "let nobody hurt the house," and that "[Thomas had] got all [his] knives." The texts also revealed that Smith knew there was a gun in Thomas's backpack. In one text, Smith said, "I'm going for the backpack."

The recordings from the police body cameras confirmed that Smith was jittery and speaking quickly and that he said he was very thirsty. Due to Smith's speech and behavior, Cason believed that Smith was under the influence of "methamphetamine, amphetamine, or speed." Although Smith told McKnight that there was a bag of methamphetamine in the house, a search failed to find any illegal drugs. Smith said he was "high as hell" and felt as if he had

4

ingested PCP, so McKnight instructed one of his deputies to have Smith's blood drawn for a drug test.

Several witnesses testified that Smith had a history of making bizarre statements and that he had made several that day while the police were there. Sheila Stokes, a jail captain for the Marion County Sheriff's Office, testified that, in the months leading up to the May 7 shooting, the sheriff's office received multiple disturbing phone calls from Smith, falsely claiming that people were in and around his home trying to kill him. Smith also accused Goynes and others of being out to get him, and he had threatened to commit suicide. The dispatched officers and emergency personnel repeatedly found Smith "excited," "[c]onfused," and "paranoid."[3]

Dr. Amy Gruszecki, a forensic pathologist with American Forensics in Mesquite, Texas, testified that, on May 11, 2018, an autopsy was performed on Thomas. The autopsy determined that the cause of death was gunshot wounds to the head and neck, and the death was determined to be a homicide. Gruszecki testified that she could not determine which shot occurred first. Due to the lack of stippling on Thomas's skin, the gunshots were classified as indeterminate or distant-range wounds. She surmised that Thomas was likely moving when he was shot. Yet, on cross-examination, Gruszecki admitted that she could not determine whether it was Thomas or Smith who was moving when the shot occurred. The autopsy also revealed that Thomas did not have crack cocaine in his system, but Gruszecki testified that, in her independent expert opinion,

---

[3]Cason testified that Smith told him that all the knives had been removed from his house and that a bat had been taken as well. Nonetheless, Cason found a block of knives in the kitchen and saw a bat hanging over the fireplace. Similarly, Deputy Robert Davis, who was processing the scene, testified that Smith made several odd statements, including that Goynes was trying to "overdose" him, that Goynes was poisoning his milk, and that Goynes had sent a dog to the house to bark.

she would expect any crack to have been completely metabolized between ingesting it on May 7 and Thomas's death on May 10.

Christi Cheng, a forensic scientist for the Texas Department of Public Safety's (DPS) crime laboratory, testified that she had conducted a DNA analysis on the handgun, its magazine, and swabs of the blood-stained area of the living room. She was unable to make any DNA comparisons from the handgun or magazine because there were five different DNA traces on it, but she testified that the DNA swabs from blood in the living room matched Thomas.

Smith, testifying in his own defense, admitted to being diagnosed with schizoaffective disorder and to taking several medications to manage his mental health. Smith also testified that he had been previously convicted of several crimes, including simple assault, burglary of a building, driving while intoxicated, and evading arrest.

Smith explained that Thomas had been living at his house for a while. Smith spent weeks trying to get Thomas to leave. At some point, Smith would drive Thomas into town and drop him off. But, within a short period of time, Thomas would show up again, knocking on his door. It was around that time that Smith voluntarily checked himself into the Department of Veterans Affairs clinic because he was suffering from delusions.

A few days prior to the shooting—Smith estimated it was May 2 or May 3—Thomas talked to Smith about the details of an "old murder" in Marion County. Smith said he was put "on edge" when Thomas claimed to be the perpetrator of the murder. Thomas was also trying to get Smith to purchase a gun from him even though Smith said he had a rule that no firearms were

allowed in his house because he was a convicted felon. Smith said that he planned to purchase the gun so he could throw it "across the bushes" to get it away from his house.

As was Thomas's pattern, he returned to Smith's house on May 6. On his mother's advice, Smith called the police, spoke with Tonya Hulett, and informed her that Thomas had a gun. Even so, no deputies ever came to Smith's house. That night, Thomas went into Smith's room "over and over again," asking him if he wanted a hit of marihuana. Smith testified that he did not ingest any drugs that night or during the following morning. Because Thomas was acting crazy, Smith said that he "waited until daybreak," got dressed, and prepared himself for the "worst situation." Smith also sent Goynes several texts while he waited.

During his testimony, Smith explained that he and Thomas were sitting on different sofas, facing one another, and that the backpack containing the gun was sitting on a wheelchair across the coffee table from Thomas. Smith "wanted [his] house back," but when he asked Thomas to leave, Thomas laughed at him. Smith testified that Thomas lunged "across the table . . . to get his bag." Smith then "came up across the table . . . into [Thomas]," trying to "wrap him up." The two men collided, and the gun fell to the floor. Smith claimed that he had "no idea where the gun came from." Smith also stated that he was afraid for his life.

As they both wrestled for the gun, Smith grabbed it. Then Thomas pushed him, and the gun went off once. Smith said he then fired the gun again, aiming low, trying to "shoot him in the leg or something." Smith believed that he had shot Thomas in the leg with the second shot, and he asked Thomas "to stay down." Instead, Thomas got up and "[kept] coming" after Smith, so he pointed the gun at Thomas and fired twice more. Smith claimed that he had not intended to

kill Thomas. He then threw the gun down, got into his car, left the house, and texted Goynes to tell her to call the police because they "won't respond to [his] request for help." Smith was asked if he had ever denied shooting Thomas, and he said, "No, I always tell I did it."

## II. Gruszecki's Testimony Did Not Violate the Confrontation Clause

In his first point of error, Smith argues that allowing Gruszecki to present expert testimony violated his rights under the Confrontation Clause because her testimony was based on an autopsy that she did not perform and an autopsy report that she did not prepare.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "[T]o implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature." *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (citing *Crawford v. Washington*, 541 U.S. 36, 50–52, 59 (2004)). We employ a de novo review in determining "whether a statement is testimonial or non-testimonial." *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). A statement is "testimonial" when circumstances objectively indicate it was taken for the primary purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "A document created solely for an 'evidentiary purpose[]' . . . made in aid of a police investigation . . . ranks as testimonial." *Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011). Once the two *Crawford* conditions have been met and the Confrontation Clause has been implicated, testimonial hearsay

8

is admissible only where "(1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant." *Woodall*, 336 S.W.3d at 642.

At trial, Smith objected to Gruszecki's testimony, arguing, in part, that it violated his rights under the Confrontation Clause because he was being denied the opportunity to cross-examine Dr. Denika Adams, the person who performed the autopsy and prepared the autopsy report. The trial court overruled his objection. On appeal, Smith relies primarily on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming* in support of his contention that the trial court erred in overruling his objection concerning the admission of an unavailable witness's testimonial out-of-court statement. But Smith's cited cases are not directly on point. Both *Melendez-Diaz* and *Bullcoming* involved forensic reports that were admitted into evidence at trial. That was not the case here.

The facts of this case are more like those of *Moore v. State*, where the trial court allowed Dyer, a forensic pathologist, to testify even though her testimony was based on an autopsy that she did not perform and histological slides and photographs that she did not prepare. *Moore v. State*, 553 S.W.3d 119, 122–23 (Tex. App.—Texarkana 2018, pet. ref'd). We held that Dyer's testimony did not violate the Confrontation Clause because neither the autopsy report nor the slides were offered into evidence; the photographs were nontestimonial in nature;[4] Dyer "reached an independent conclusion based on her review of the autopsy report, photographs, and

---

[4]Autopsy photographs are nontestimonial in nature for the purposes of the Confrontation Clause. *See* TEX. R. EVID. 801(a); *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (autopsy photograph is a nontestimonial statement); *Wood v. State*, 299 S.W.3d 200, 214–15 (Tex. App.—Austin 2009, pet. ref'd).

slides"; and she was cross-examined regarding her conclusions, the documents she reviewed, and her interpretation of the photographs and slides. *Id.* at 123–24.

Likewise, in this case, Gruszecki testified that the other forensic pathologist with American Forensics, Adams, actually performed the autopsy and prepared the autopsy report and its photographs. Although she signed off on the report, Gruszecki admitted that she did not supervise the autopsy or sign off on the autopsy report as the supervisor. She testified that, because the American Forensics office was a "very small practice" and they both had the requisite medical training and expertise, she and Adams regularly "checked each other" and performed a "quality assurance[]" process by reviewing autopsy reports, autopsy photographs, and all the other autopsy-related information before signing off on each other's work. In preparation for her testimony, Gruszecki reviewed everything that Adams would have had to review, including the autopsy report, the photographs, Thomas's medical records, the police "paperwork" sent with Thomas's body, and the reports from her office's "certified investigator" who interviewed family and law enforcement regarding Thomas.

Gruszecki testified regarding the wounds shown in the autopsy photographs, the bullets' pathways through Thomas's body, and the internal damage resulting from them. She explained that, based on the autopsy report, the photographs, and the other related information, she had made several "findings." In her expert opinion, Thomas's death was caused by two gunshot wounds—one to the head and one to the neck—that were fired from a gun that was an

intermediate or middle distance from his body, while Thomas and/or the person firing the gun could have been moving.[5] The autopsy report was not offered or admitted into evidence.

Rather than being a surrogate witness proffering an explanation of another person's testimonial evidence, the record reflects that Gruszecki reached independent conclusions based not only on her review of the autopsy report, but also photographs and other autopsy-related information. *See Paredes v. State*, 462 S.W.3d 510, 517–18 (Tex. Crim. App. 2015); *Moore*, 553 S.W.3d at 123–24. Moreover, as in *Moore*, Smith was able to cross-examine Gruszecki regarding her conclusions and the documents she reviewed and elicited testimony that (1) she was unable to determine which of the two wounds was suffered first, (2) she was unable to determine which of the gunshots caused Thomas's death, and (3) Thomas's gunshot wounds could have been caused during a "scuffle" with Smith. *See Moore*, 553 S.W.3d at 123–24.

Based on the foregoing, we are persuaded that Gruszecki's testimony did not violate the Confrontation Clause, and we overrule this point of error.

## III. Allowing Untimely Disclosed Expert Witness to Testify Was Not Error

In his second point of error, Smith argues that the trial court erred in allowing Gruszecki's testimony because the State failed to timely notify him that the State intended to call her as an expert witness.

Upon the defendant's proper request, the State is required to disclose the expert witnesses it intends to call at trial, and unless otherwise ordered by the court, the State must make this

---

[5]Gruszecki testified that Thomas's manner of death was "homicide" and explained that, in forensics, there are only five manners of death: natural, accidental, suicidal, homicidal, and undetermined. She explained the differences between them and why she found Thomas's death to be a homicide.

disclosure "not later than the 20th day before the date that jury selection in the trial is scheduled to begin."[6] TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (Supp.); *Hightower v. State*, 629 S.W.2d 920, 925 (Tex. Crim. App. [Panel Op.] 1981); *Osbourn v. State*, 59 S.W.3d 809, 816 (Tex. App.—Austin 2001), *aff'd*, 92 S.W.3d 531 (Tex. Crim. App. 2002). If the trial court allows a previously undisclosed State's witness to testify, appellate courts review that decision for an abuse of discretion. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993); *Hardin v. State*, 20 S.W.3d 84, 88 (Tex. App.—Texarkana 2000, pet. ref'd). In determining whether the trial court abused its discretion, we consider (1) whether the State's action constituted bad faith and (2) whether the defendant could have reasonably anticipated that the undisclosed witness would testify. *See Nobles v. State*, 843 S.W.2d 503, 514–15 (Tex. Crim. App. 1992); *Hardin*, 20 S.W.3d at 88.

In a letter dated September 6, 2019, Smith formally requested discovery under Article 39.14 of the Texas Code of Criminal Procedure. On March 29, 2021, Smith filed a motion for discovery seeking, in part, "the names, addresses and professions of all expert witnesses" the State intended to call at trial. On July 1, 2021, eleven days prior to jury selection, the trial court

---

[6]Article 39.14(b) of the Texas Code of Criminal Procedure states:

> On a party's request made not later than the 30th day before the date that jury selection in the trial is scheduled to begin or, in a trial without a jury, the presentation of evidence is scheduled to begin, the party receiving the request shall disclose to the requesting party the name and address of each person the disclosing party may use at trial to present evidence under Rules 702, 703, and 705, Texas Rules of Evidence. Except as otherwise provided by this subsection, the disclosure must be made in writing in hard copy form or by electronic means not later than the 20th day before the date that jury selection in the trial is scheduled to begin or, in a trial without a jury, the presentation of evidence is scheduled to begin. On motion of a party and on notice to the other parties, the court may order an earlier time at which one or more of the other parties must make the disclosure to the requesting party.

TEX. CODE CRIM. PROC. ANN. art. 39.14(b).

granted Smith's motion for discovery and ordered the State to comply with the request.[7]  On the same day, the State disclosed its list of witnesses, which included Gruszecki.  Smith claimed not to have received Gruszecki's curriculum vitae until July 9, just three days prior to trial.

Smith contends that the State's disclosure was not timely under Article 39.14(b) because the State failed to disclose its witnesses at least twenty days before trial. Smith also argues that "the State's failure to timely provide notice should be presumed as bad faith given that there was no innocent explanation offered by the State."  Yet, the record reflects that the State's file in the case, which included Gruszecki's curriculum vitae, had been available to Smith throughout the case, that the State had "offered repeatedly" to let Smith look through the file, and that the State made its witness disclosure on the same day the trial court signed the discovery order.  *See Osbourn*, 59 S.W.3d at 816 (evidence should be admitted unless the State acted in bad faith or willfully failed to respond to the trial court's order under Article 39.14(b)).  In addition, the evidence supports the trial court's finding that Smith could have reasonably anticipated that Gruszecki would testify to the manner and means of Thomas's death.  *See Branum v. State*, 535 S.W.3d 217, 226 (Tex. App.—Fort Worth 2017, no pet.).  Even though the autopsy was conducted by Adams, Gruszecki signed off on the autopsy report, which Smith had obtained on September 25, 2019.  *See Lemasuier v. State*, 91 S.W.3d 897, 900–01 (Tex. App.—Fort Worth

---

[7]We note that no court order is necessary to trigger the State's disclosure obligations under Article 39.14(b).  Indeed, in 2015, the Legislature amended Article 39.14(b) to require a party receiving a request for disclosure of expert witnesses to provide the information to the requesting party based on the request alone without an order from the trial court.  *See* Act of May 22, 2015, 84th Leg., R.S., ch. 459, § 1, 2015 Tex. Gen. Laws 1774, 1774 (current version at TEX. CODE CRIM. PROC. art. 39.14(b)).  The amendment became effective September 1, 2015.  *See* Act of May 22, 2015, 84th Leg., R.S., ch. 459, § 3, 2015 Tex. Gen. Laws 1774, 1774.

2002, pet. ref'd) (noting prosecutor's open file and witness's name in the report in the State's file).

As a result, we cannot conclude that the trial court abused its discretion in allowing Gruszecki to testify regarding Thomas's autopsy. Moreover, even though Smith argued that he was unfairly surprised by the untimely disclosure, he failed to request a continuance, rendering any error on the part of the trial court harmless. *See Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994) (per curiam). Accordingly, we overrule this point of error.

## IV.    Autopsy Photographs Were Not Hearsay

In his third point of error, Smith argues that the trial court should have sustained his hearsay objection to the autopsy photographs because Adams, rather than Gruszecki, took the photos.

This Court reviews a trial court's admission of evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008). A trial court is given wide discretion when deciding admissibility of photographs. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). An abuse of discretion exists when the trial court's ruling falls outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

During the State's direct examination of Gruszecki, the State sought to admit nine photographs of Thomas's body that were taken during the autopsy. Smith objected to the photos, arguing that, because Gruszecki did not take them, they were inadmissible hearsay. The trial court overruled Smith's objection and admitted the photos into evidence. Gruszecki testified

14

that, in the normal course of business at American Forensics, everyone brought in for examination was assigned a "unique case identifying number" and that the same such number was on both the autopsy report and the photos, indicating that they were all part of the same case. She testified that such records were kept in the normal course of business, that the photos had not been altered, and that they accurately depicted what was stated in the autopsy report. The nine photos include pictures of the two slugs recovered from Thomas's body and rather close-up images of where the slugs entered and exited Thomas's body. She testified to what each of the photos depicted and any conclusions that she drew from them.

Generally, hearsay is inadmissible at trial. *See* TEX. R. EVID. 802. Hearsay is an out-of-court statement made by a third party that a witness is offering into evidence for the truth of the matter asserted. TEX. R. EVID. 801(d). For there to be hearsay, there must be a "statement." *See* TEX. R. EVID. 801(c), (d). A statement is defined as "a person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression." TEX. R. EVID. 801(a). Photographs, like the autopsy photographs at issue here, are generally not hearsay because they are not statements. *See Herrera*, 367 S.W.3d at 773; *Wood*, 299 S.W.3d at 214–15; *see also Black v. State*, 358 S.W.3d 823, 831 (Tex. App.—Fort Worth 2012, pet. ref'd).[8] Here, as there was no indication that the autopsy photographs were "intended as a substitute for verbal expression," the trial court was within its discretion to determine that the autopsy photographs were not statements and, therefore, not hearsay. *See* TEX. R. EVID. 801(a); *Herrera*,

---

[8]A photograph might contain statements amounting to hearsay. *See Black*, 358 S.W.3d at 831 (photo of a cell phone screen depicting messages); *see also Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002) ("Inadmissible hearsay testimony does not become admissible simply because it is contained within an admissible document or transcript.").

15

367 S.W.3d at 773; *Wood*, 299 S.W.3d at 214–15. As a result, the trial court was within its discretion to overrule Smith's objection. We, therefore, overrule Smith's third point of error.

## V. Admitting Extraneous-Offense Evidence Was Harmless

In his fourth point of error, Smith argues that the trial court erred in admitting evidence that he had previously assaulted his girlfriend, Terra Long, because (1) the State failed to provide proper pretrial notice under Rule 404(b) of the Texas Rules of Evidence that it intended to introduce such evidence, and (2) Long's testimony did not open the door to allow the evidence to be admitted.

### A. No Pretrial Notice Was Required

Under Rule 404(b), if the State intends to introduce, during its case-in-chief, evidence of an extraneous offense or other bad act, the State must provide the defense with "reasonable notice before trial." TEX. R. EVID. 404(b). However, the State introduced the evidence of assault in rebuttal, during its cross-examination of Long, who was a defense witness. "The State is not required to provide pretrial notice of extraneous-offense evidence offered in rebuttal." *Gullatt v. State*, 590 S.W.3d 20, 26 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002)).

### B. Admitting Long's Testimony, if Erroneous, Was Harmless Error

On direct examination by Smith, Long testified that, at times, Thomas was an unwanted houseguest of Smith's. But Long also testified as follows:

> Q.     And was [Thomas] a roommate of Prentis [Smith], or was he like an unwelcome guest, or how would you classify his situation?

16

A.    Prentis had -- he was homeless, and Prentis felt sorry for him and let him stay there.  He had nowhere to stay.

Q.    And, now, would Prentis sometimes give Freddy a ride to town?

A.    Yes.  He took care of him.

Shortly thereafter, a hearing was held outside the presence of the jury.  The State argued that Long's testimony created a false impression of Smith's character—that Smith was a kind person to others.  According to the State, such testimony opened the door to correct that impression by introducing evidence that Smith was not always kind, such as in 2015 when he physically assaulted Long and "sent her to the hospital."  The trial court agreed with the State and overruled Smith's objection, and the jury returned to the courtroom.

When the State cross-examined Long, she testified that Smith's taking care of Thomas was "kind-hearted."  That said, Long also stated that Smith had not always been so kind, such as the incident in 2015 when he physically assaulted her in front of her child, leaving her with two black eyes and resulting in a trip to the hospital.

Smith argues that Long's testimony did not open the door and that, therefore, the trial court erred in admitting the extraneous-offense evidence.  We review a trial court's ruling on the admissibility of extraneous offenses under an abuse of discretion standard.  *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Hernandez v. State*, 351 S.W.3d 156, 160 (Tex. App.—Texarkana 2011, pet. ref'd).  If the trial court's decision is within the zone of reasonable disagreement, the trial court has not abused its discretion, and we will uphold the trial court's ruling.  *De La Paz*, 279 S.W.3d at 343–44; *Hernandez*, 351. S.W.3d at 160.  The trial court's

17

evidentiary ruling will not be disturbed if it is correct on any theory of law applicable to that ruling. *De La Paz*, 279 S.W.3d at 343–44; *Hernandez*, 351 S.W.3d at 160–61.

Extraneous-offense evidence may be admitted to rebut a defensive theory that is raised during the defense's case-in-chief. *See De La Paz*, 279 S.W.3d at 345–46; *Rubio v. State*, 607 S.W.2d 498, 501 (Tex. Crim. App. 1980). If the testimony of a defense witness creates a false impression on direct examination, it can open the door for the State to correct that false impression on cross-examination through the introduction of extraneous-offense evidence. *See Duren v. State*, 87 S.W.3d 719, 730–31 (Tex. App.—Texarkana 2002, pet. struck); *see also Lopez v. State*, 928 S.W.2d 528, 530–32 (Tex. Crim. App. 1996).

Even assuming, without finding, that the trial court erred in admitting the extraneous-offense evidence, the error was harmless. To determine whether the erroneous admission of evidence amounts to reversible error, we look to Rule 44.2(b) of the Texas Rules of Appellate Procedure, governing non-constitutional error in criminal cases. *See* Tex. R. App. P. 44.2(b). Neither appellant nor the State bears "the burden to demonstrate whether appellant was harmed by the trial court's error." *See Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001). Rather, it is this Court's responsibility to assess, from the context of the error, whether the judgment requires reversal because the error affected appellant's substantial rights. *See id.* "A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In making this determination, we review the record as a whole. *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946). While we may consider

18

whether there is overwhelming evidence of Smith's guilt, we are to consider the trial court's erroneous admission of the extraneous-offense evidence in the context of the entire record. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002).

There is ample evidence supporting Smith's guilt. When the officers arrived at his house, Smith was agitated and incoherent, and he said that he was "high as hell." Although no illegal drugs were found in the house, Smith's blood tested positive for methamphetamine. Prior to any confrontation with Thomas, Smith's text messages showed that he was planning a violent confrontation, as the messages indicated that Smith was "real scared," that Smith believed there was a gun in Thomas's backpack, and that Smith was "going for the backpack." Smith told the officers that, before confronting Thomas, he had put on his "fighting attire" because he was preparing for the "worst situation."

Thomas died by homicide with two gunshot wounds to the head and neck causing his death. Thomas's body was found with a gun near him, and he had a crack pipe in his hand. Smith admitted several times that night that he had shot Thomas. Smith told McKnight that he "[m]ore than likely" shot Thomas. According to Cason, Smith said, "I shot, I shot, I asked him to stay down, and I shot low." Smith also said he shot Thomas again because Thomas was still "talking shit."

Carl Beaty worked for the Marion County Jail at the time of the shooting. After Smith was transported to the jail, Beaty made an incident report related to Smith. The report was admitted into evidence during the trial. The report stated that, while being transported to C-Tank where he would be housed, Smith made hand motions to the other prisoners, "as if he was using

19

a gun towards someone." Once Smith was placed in C-Tank, Beaty "clearly heard the inmates ask him what he was in there for, and [Smith] stated murder, and when asked who he had killed, he stated Freddy [Thomas]."

While Smith admitted that he shot Thomas, he claimed to have done so in self-defense or by accident. Smith claimed that Thomas had lunged at him, wrestled with him, and pushed and fought him. Smith maintained that, during the scuffle, the gun fell to the floor, but he did not know where it had come from. Smith explained that he shot Thomas, trying to incapacitate him, because he was in fear for his life, but that he did not want to kill anyone. Yet, Smith failed to convey any of that information to the officers who spoke with him after the shooting.

The extraneous-offense evidence was barely a part of the trial. The State spent very little time questioning Long about the extraneous offense and did not mention it at all during its closing arguments. *See Russell v. State*, 113 S.W.3d 530, 550–51 (Tex. App.—Fort Worth 2003, pet. ref'd) (admission of extraneous-offense evidence harmful, in part, because State spent substantial amount of time proving it up and referred to it several times during closing argument); *Booker v. State*, 103 S.W.3d 521, 538 (Tex. App.—Forth Worth 2003, pet. ref'd) (op. on reh'g). Due to Smith's claims, the jury was instructed regarding self-defense and negligence. Also, in addition to murder and acquittal, they were given the opportunity to find Smith guilty of the lesser-included offenses of manslaughter and criminally negligent homicide.

Considering not only the substantial evidence of Smith's guilt, but also the context of the entire case against Smith, the jury charge, and the parties' arguments, and assuming error, we nevertheless hold that the trial court's admission of the extraneous-offense evidence did not

20

adversely influence the jury or had only a slight effect. *See Motilla*, 78 S.W.3d at 359. Thus, we disregard any error as harmless. *See* TEX. R. APP. P. 44.2(b). Accordingly, we overrule this point of error.

## VI.     Allowing Peyton to Testify Was Not Error

In his fifth point of error, Smith argues that the trial court erred by allowing Sheryl Peyton, a forensic scientist with the DPS's crime laboratory, to testify regarding Smith's blood tests because the State failed to lay a sufficient predicate showing that the blood sample tested was actually drawn from Smith on the day of the shooting.

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *See Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007). To establish the facts necessary to support the trial court's decision to admit the results of a blood test into evidence, "a proper chain of custody of the blood sample that was drawn from the accused and later tested must be established." *Penley v. State*, 2 S.W.3d 534, 537 (Tex. App.—Texarkana 1999, pet. ref'd); *Durrett v. State*, 36 S.W.3d 205, 208 (Tex. App.—Houston [14th Dist.] 2001, no pet.). In the absence of any evidence of tampering or alteration, "[p]roof of the beginning and end of a chain of custody will support the admission of the evidence[.]" *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd); *see also Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990); *Durrett*, 36 S.W.3d at 208. Generally, in such cases, gaps or theoretical breaches that may exist in the chain of custody "go to the weight of the evidence rather than to its admissibility." *Durrett*, 36 S.W.3d at 208; *see also Lagrone v. State*, 942 S.W.2d 602, 617

21

(Tex. Crim. App. 1997). Where the evidence before the jury allows the jury to reasonably find that the test at issue was performed on blood drawn from the accused, the evidentiary requirements needed to authenticate the test being offered into evidence are satisfied. *See* TEX. R. EVID. 901(a); *Dossett*, 216 S.W.3d at 17.

On the second day of trial, during the State's case-in-chief, the State brought a motion in limine to exclude all references to the State's failure to introduce evidence related to Smith's blood-test results. The State argued that the designated lab scientist on the State's witness list was unexpectedly unavailable, and Smith had objected to a substitute witness, Sheryl Peyton, because she was not on the State's witness list. Specifically, the motion sought an order requiring Smith to "refrain from mentioning or referring to in any way the following":

1.   That the State has failed to provide any witnesses to testify with regard to the blood test results of the defendant.

2.   That the State has failed to provide the results or lab report for the blood draw of the defendant.

3.   That the State failed to provide lab test results regarding the blood draw of the Defendant because such results do not support their contention that the Defendant was under the influence of a drug, controlled substance or illicit substance or other intoxicant.

4.   Any reference or inference to the blood draw or blood draw results or lab report of same.

The trial court granted the motion and held that, if Smith wanted to reference, in any way, the State's failure to introduce blood test results, the trial court would "tell the State to call the witness." Smith affirmed that, after consultation with counsel, he would "go along with the limine and . . . the State would not be allowed to have their witness come and testify." The trial

22

court clearly stated, "[W]e can't hedge on this issue . . . if you bring it up, I'm going to tell the State to have the witness here." Smith's counsel said he understood and acknowledged that the court's ruling meant that he was "being basically ordered by the Court not to bring that up" or else Peyton could testify. Smith, himself, confirmed that he had heard the court's ruling.

Even so, later in the trial that same day, Smith testified on direct examination that he had not ingested "any drugs the evening or that morning" before the confrontation with Thomas. On cross-examination, he said that he "didn't use drugs in those days" and had not taken any drugs for "maybe a week" before the shooting.

In rebuttal, the State called Peyton to testify regarding Smith's blood test results. Smith objected, arguing that there had been no predicate testimony about the blood draw itself, the submission of the blood to the crime laboratory, or the blood's chain of custody. Over Smith's predicate and Confrontation Clause objections, the toxicology report was admitted into evidence, and Peyton testified that she tested a sample of blood from Smith that was submitted by the Marion County Sheriff's Office for case number 180156. The testing revealed 0.26 milligrams of methamphetamine per liter of blood and less than 0.05 milligrams of amphetamine per liter of blood.

The contents of the toxicology report support Peyton's testimony. The toxicology report states that the sample was submitted by the Marion County Sheriff's Office under identifying case number 180156, on July 9, 2018, by Robert Davis, who delivered the sample in person. The report lists Smith as the subject of the sample, and the evidence is described in part as "[b]lood in (2) gray top tubes labeled 'Prentis Smith.'"

23

In Peyton's opinion, Smith had to have ingested methamphetamine recently because the half-life of methamphetamine—the time it takes for half of it to be out of the body—was between ten and fourteen hours. So, if Smith had not ingested methamphetamine in the week prior to the shooting, there should not have been any present in his blood sample. Depending on how much methamphetamine was taken, she expected it would take a day or two for "all of it to be gone from the blood." While Peyton performed the toxicology tests on Smith's blood, she admitted on cross-examination that she did not draw the blood from Smith and that her involvement only began after the blood sample reached the lab in Austin.

After Peyton's testimony concluded, the State offered into evidence, and the trial court admitted over Smith's objections, the affidavit for search warrant for Smith's blood signed by McKnight, the executed search warrant, and the search warrant return and inventory stating that "[s]pecimens of [Smith's] blood" were seized. The affidavit of Intha Vaughan, which stated that she was the registered nurse who drew Smith's blood on May 7, 2018, at 4:51 p.m., was also offered and admitted into evidence.

Here, there is sufficient evidence to establish the beginning and the end of the chain of custody for Smith's blood. Charles Rogers, a criminal investigator with the Marion County Sheriff's Office, took Smith to the hospital because that was "standard procedure if someone is under the influence." The warrant ordered a medical worker to take samples of Smith's blood, to take those samples in the presence of a law enforcement officer, and to "deliver the said samples to the said law enforcement officer." Vaughan's affidavit states that she is a registered nurse, who, on May 7, 2018, at 4:51 p.m., "withdrew a blood specimen from . . . Prentis Earl Smith II

24

. . . using reliable procedures as recognized by the scientific community in the State of Texas." The affidavit also states that the "specimen was properly labeled and sealed." The warrant return and inventory confirm that the warrant was executed and that the designated law enforcement officer received "[s]pecimens of the suspect's blood."[9] Peyton's testimony established the end of the chain of custody, as she stated that the blood tested was Smith's. The toxicology report also verified that (1) the blood tested belonged to Smith, and (2) the listed offense occurred on the same day as the shooting.

Because there is proof of the beginning and end of the chain of custody, and no evidence of tampering, the evidence is sufficient to support admission of Peyton's testimony. *See Stoker*, 788 S.W.2d at 10; *Durrett*, 36 S.W.3d at 208. Any gaps or breaches in the chain of custody "go to the weight of the evidence rather than to its admissibility." *Durrett*, 36 S.W.3d at 208; *see also Lagrone*, 942 S.W.2d at 617. Thus, the trial court did not err in admitting Peyton's testimony because the evidence submitted by the State was adequate for the jury to reasonably find that the blood tested by Peyton was drawn from Smith on the day of the shooting. *See* TEX. R. EVID. 901(a); *Dossett*, 216 S.W.3d at 17. As a result, we overrule this point of error.

## VII.  Peyton's Testimony Did Not Violate the Confrontation Clause

In his final point of error, Smith argues that allowing Peyton to testify that the blood she tested was Smith's violated his rights under the Confrontation Clause.[10]

---

[9]Although the affidavit, warrant, and inventory were admitted over Smith's objections, we must consider them as evidence because he does not challenge their admission on appeal.

[10]The legal standards for a Confrontation Clause analysis are detailed above.

25

As detailed above, over Smith's objection, Peyton testified, and the admitted toxicology report corroborated, that she personally tested a blood sample labeled "Prentis Smith," that it was submitted by the Marion County Sheriff's Office, that the "subject of that blood kit was Prentis Earl Smith, II," and that the sample "was submitted" with a listed case number of 180156. Smith argues that, because Peyton neither drew Smith's blood nor witnessed it being drawn, his rights under the Confrontation Clause were violated because he was "deprived of an opportunity to cross-examine the witnesses who might establish that the blood that Peyton tested actually belonged to [Smith]." This argument is without merit.

Here, the Confrontation Clause was not implicated because Peyton did not testify to another's out-of-court statement. *See Woodall*, 336 S.W.3d at 642. Peyton testified that her involvement in and knowledge of the case did not begin until the labeled sample arrived at the lab. On cross-examination, she admitted that she did not draw the blood sample, witness it being drawn, know when it was drawn, or know who drew it. Most importantly, she did not testify to any statement made by the person who drew the sample and likewise did not testify that the sample she tested was the same sample drawn from Smith on the day of the shooting. Because Peyton only testified to matters within her personal knowledge acquired from having worked in the lab, the Confrontation Clause was not implicated. *See id.*; *Camacho v. State*, Nos. 2-07-322-CR & 2-07-323-CR, 2009 WL 2356885, at *3 (Tex. App.—Fort Worth July 30, 2009, pet. ref'd) (per curiam) (mem. op., not designated for publication) (Sixth Amendment concerns did not apply to chemist's in-court statement based upon her own personal knowledge acquired from

having trained and worked at the DPS laboratory);[11] *Blaylock v. State*, 259 S.W.3d 202, 207–08 (Tex. App.—Texarkana 2008, pet. ref'd) (holding that testimony of the expert witness concerning the chemical analysis of the substance, which was determined by applying his expertise to reliable scientific test data, was admissible as he was subject to cross-examination, so the requirements of the Confrontation Clause were fulfilled). Therefore, we overrule Smith's sixth point of error.

## VIII. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted: March 3, 2022
Date Decided: June 7, 2022

Do Not Publish

---

[11]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).